Natalie Finkelman Bennett (PA Bar No. 57197)
SHEPHERD, FINKELMAN, MILLER
 & SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: 610/891-9880
Facsimile: 610/891-9883
nfinkelman@sfmslaw.com

Attorneys for Plaintiffs
[Additional Counsel Listed on Signature Page]

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PHYLLIS and MORTON WEINSTOCK, On Behalf of Themselves and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>FIDELITY NATIONAL TITLE INSURANCE COMPANY, CHICAGO TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, FIDELITY NATIONAL FINANCIAL, INC., FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, CENSTAR TITLE INSURANCE COMPANY, T.A. TITLE INSURANCE COMPANY, FIRST AMERICAN CORPORATION, COMMONWEALTH LAND TITLE INSURANCE COMPANY, COMMONWEALTH LAND TITLE INSURANCE COMPANY OF NEW JERSEY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., STEWART TITLE GUARANTY COMPANY, NATIONAL LAND TITLE INSURANCE COMPANY, STEWART | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

INFORMATION SERVICES CORPORATION, :
OLD REPUBLIC NATIONAL TITLE :
INSURANCE COMPANY, AMERICAN :
GUARANTY TITLE INSURANCE COMPANY, :
OLD REPUBLIC INTERNATIONAL :
CORPORATION, and TITLE INSURANCE :
RATING BUREAU OF PENNSYLVANIA, :
: 
          Defendants. :
                                                              :

Plaintiffs, Phyllis and Morton Weinstock ("Weinstock"), by their attorneys, on behalf of themselves and all others similarly situated, bring this action for treble damages and injunctive relief under the antitrust laws of the United States against the above named Defendants, demand a trial, and complain and allege as follows:

I.   **JURISDICTION AND VENUE**

1.   This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§15, 26) to obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable attorneys' fee, against Defendants for the injuries sustained by Plaintiffs and the members of the Class which they represent by reason of defendants' and their co-conspirators' violations, as hereinafter alleged, of Section 1 of the Sherman Act (15 U.S.C. §1).

2.   Defendants transact business, maintain offices or are found within the Eastern District of Pennsylvania. The interstate commerce described hereinafter is carried on, in part, within the Eastern District of Pennsylvania and the conspiratorial acts herein alleged were carried on, in part, in the Eastern District of Pennsylvania.

II.   **PLAINTIFF**

3.   Plaintiffs, Phyllis and Morton Weinstock, are individuals residing within the Commonwealth of Pennsylvania. During the Class period, Plaintiffs purchased title insurance

directly from one or more of the Defendants herein and have been injured by reason of the antitrust violations alleged.

### III. DEFENDANTS

4. The Fidelity family of title insurance companies (collectively, "Fidelity") - which includes Defendant Fidelity National Title Insurance Company ("Fidelity Title"), Defendant Chicago Title Insurance Company ("Chicago Title"), Defendant Ticor Title Insurance Company ("Ticor Title"), Defendant Ticor Title Insurance Company of Florida ("Ticor Title Florida"), and their affiliates - is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Pennsylvania. Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion. Fidelity Title, Chicago Title, Ticor Title and Ticor Title Florida are members of the Title Insurance Rating Bureau of Pennsylvania ("TIRBOP") and have charged title insurance rates in Pennsylvania that TIRBOP collectively sets.

5. Fidelity Title, Chicago Title, Ticor Title, and Ticor Title Florida and their affiliates are wholly-owned and/or controlled by Defendant Fidelity National Financial, Inc. ("Fidelity National"), a Delaware corporation headquartered in Jacksonville, Florida. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. Fidelity National had 2006 revenues of roughly $9.4 billion. Fidelity engaged in the conduct challenged herein with the approval and assent of Fidelity National.

6. The First American family of title insurance companies (collectively, "First American") - which includes Defendant First American Title Insurance Company ("First American Title"), Defendant Censtar Title Insurance Company ("Censtar"), Defendant United General Title Insurance Company ("United General Title"), Defendant T.A. Title Insurance

Company ("T.A. Title"), and their affiliates - is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Pennsylvania. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title, Censtar, United General Title and T.A. Title are members of TIRBOP and have charged title insurance rates in Pennsylvania that TIRBOP collectively sets.

7. First American Title, Censtar United General Title, and T.A. Title and their affiliates are wholly-owned and/or controlled by Defendant First American Corporation ("FAC"), a California corporation headquartered in Santa Ana, California. Through its subsidiaries, FAC is a provider of title insurance, business information, and related products and services. FAC had 2006 revenues of roughly $8.5 billion. First American engaged in the conduct challenged herein with the approval and assent of FAC.

8. The LandAmerica family of title insurance companies (collectively, "LandAmerica") - which includes defendant Commonwealth Land Title Insurance Company ("Commonwealth"), Defendant Commonwealth Land Title Insurance Company of New Jersey ("NJ Commonwealth"), Defendant Lawyers Title Insurance Corporation ("Lawyers Title"), and Defendant Transnation Title Insurance Company ("Transnation"), and their affiliates - is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Pennsylvania. Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion. Commonwealth, NJ Commonwealth, Lawyers Title and Transnation are members of TIRBOP and have charged title insurance rates in Pennsylvania that TIRBOP collectively sets.

9. Commonwealth, NJ Commonwealth, Lawyers Title and Transnation are

wholly-owned and/or controlled by Defendant Land America Financial Group, Inc. ("LAFG"), a Virginia corporation headquartered in Glen Allen, Virginia. Through its subsidiaries, LAFG is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate. LAFG had 2006 revenues of roughly $4 billion. LandAmerica engaged in the conduct challenged herein with the approval of LAFG.

10. The Stewart family of title insurance companies (collectively, "Stewart") - which includes Defendant Stewart Title Guaranty Company ("Stewart Title"), Defendant National Land Title Insurance Company ("National Land"), and their affiliates - is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Pennsylvania. Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to roughly $2 billion. Stewart Title and National Land are members of TIRBOP and have charged title insurance rates in Pennsylvania that TIRBOP collectively sets.

11. Stewart Title and National Land are wholly-owned and/or controlled by Defendant Stewart Information Services Corporation ("SISC"), a Delaware corporation headquartered in Houston, Texas. Through its subsidiaries, SISC is a provider of title insurance and related information and post-closing lender services. SISC had 2006 revenues of roughly $2.5 billion. Stewart engaged in the conduct challenged herein with the approval and assent of SISC.

12. The Old Republic family of title insurance companies (collectively "Old Republic") - which includes defendant Old Republic National Title Insurance Company ("Old Republic National"), and Defendant American Guaranty Title Insurance Company ("American

Guaranty") and their affiliates - is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Pennsylvania. Nationally, Old Republic accounts for approximately 6 percent of title premiums, which in 2006 amounted to roughly $1 billion. Old Republic National and American Guaranty are members of TIRBOP and have charged title insurance rates in Pennsylvania that TIRBOP collectively sets.

13. Old Republic National and American Guaranty, and their affiliates are wholly owned and/or controlled by Defendant Old Republic International Corp. ("Old Republic International"), a Delaware corporation headquartered in Chicago, Illinois. Through its subsidiaries, Old Republic International is a provider of title insurance, general insurance, mortgage guaranty insurance and life and health insurance. Old Republic International had 2006 revenues of roughly $3.8 billion. Old Republic engaged in the conduct challenged herein with the approval and assent of Old Republic International.

14. Throughout the relevant damages period, Defendants charged Pennsylvania consumers identical title insurance rates that were collectively set through TIRBOP.

15. Defendant TIRBOP is a voluntary association of title insurers licensed by the Pennsylvania Insurance Department pursuant to Section 741 of The Insurance Company Law of 1921, 40 P.S. §910-41. TIRBOP maintains its offices in Wayne, Pennsylvania.

16. TIRBOP compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the Insurance Department. TIRBOP also prepares and submits a manual which sets forth title rates to be charged and rules to be followed by TIRBOP's members.

17. TIRBOP's membership is comprised of Defendant insurers and other title insurers that are licensed to issue policies in Pennsylvania. Currently, Old Republic, Fidelity, First

American, LandAmerica, and Stewart represent 16 of TIRBOP's 26 members.

## IV. CO-CONSPIRATORS

18. Various other person, firms and corporations not made Defendants herein have participated as co-conspirators with the Defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## V. DEFINITIONS

19. As used herein, the term "Class period" shall mean the time period beginning four years prior to the date of the filing of this suit.

## VI. CLASS ACTION ALLEGATIONS

20. Plaintiffs bring this action under Rule 23, and particularly subsection (b)(3), of the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of all persons excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who purchased directly, from one or more of the Defendants and/or their co-conspirators, title insurance for residential and commercial property in Pennsylvania during the period in suit and who have sustained damages as a result of the conspiracy herein alleged. The number of potential Class members is so numerous that joinder is impracticable.

21. Plaintiffs, as representative of the Class, will fairly and adequately protect the interest of the Class members. The interests of Plaintiffs are coincident with, and not antagonistic to those of the Class members.

22. Except as to the amount of damages each member of the Class has by itself sustained, all other questions of fact and law are common to the Class, including but not limited to, the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act (15 U.S.C. §1) and the effects of such violation.

23. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy in that, among other things, there is no interest by members of the Class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding in order to provide small claimants with a forum in which to seek redress for this antitrust violation. Whatever difficulties may exist in the management of the class action will be greatly outweighed by the class action procedure, including but not limited to providing claimants with a method for the redress of claims which may not otherwise warrant individual litigation.

## VII. TRADE AND COMMERCE

24. During all or part of the period in suit, Defendants and their co-conspirators were sellers of title insurance in Pennsylvania.

25. During the period in suit, the Defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce.

26. During the period in suit, Class members from locations outside Pennsylvania purchased commercial or residential property and title insurance within Pennsylvania.

27. During the Class period in suit, the Defendants were the major sellers of title insurance in the United States and Pennsylvania. Defendants controlled in excess of 90 percent of the market for title insurance in the United States and Pennsylvania. Total sales of title insurance by Defendants exceeded $600 million in Pennsylvania during 2003.

28. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VIII. VIOLATIONS ALLEGED

29. Beginning at least as early as March, 2004, and continuing thereafter to the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

30. The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which have been:

   (a) to fix, raise, maintain and stabilize the price of title insurance throughout Pennsylvania; and,

   (b) to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in Pennsylvania.

31. Title insurance is one of most costly items associated with the closing of a real estate transaction. In Pennsylvania, TIRBOP's collectively fixed rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranges from about $420.00 (for a $30,000.00) property to $4,733 (for a $2 million property). For more expensive homes and commercial properties, these prices are significantly higher and can reach the tens of thousands of dollars. These are among the highest rates in the United States.

32. Title insurance serves an important purpose. It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property. In Pennsylvania, title insurance is required by lenders in most residential and commercial real estate

transactions.

33. Consumers exercise little discretion in choosing the title insurer from which they purchase the insurance. That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor. Consequently, for most purchasers, the cost of title insurance is largely overlooked and seldom, if ever, challenged. Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction. There is no negotiation of price or shopping around.

34. This situation essentially removes the sale of title insurance from the normal competitive process. Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints. The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions, and purchasers are certainly in no position to question the price.

35. The most effective way for a particular title insurer to get business is to encourage those making the purchasing decisions - the lawyers, brokers, lenders - to steer business to that insurer. The best way to so motivate these third-party representatives is not through lower prices (that they are not even paying). Rather, it is through kickbacks in the form of finder's fees, gifts, and other financial enticements. Therefore, it is higher pricing (which allows for this third-party consideration), not lower pricing, that provides the best way for title insurers to compete and increase their business.

36. Pennsylvania is one of only a very small number of states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRBOP. This is authorized by Section 741 of the Insurance Company Law of 1921, 40 P.S. §910-41. There are two principal cost components that go into TIRBOP's calculation. One comprises the risk

associated with issuing the title policy. The other comprises the "agency commissions" paid to title agents.

37. The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer. That is because title insurance protects against prior events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the claim payouts on title insurance policies in Pennsylvania amount to less than 2 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) - which protects against future occurrences over which the insurer has little to no control - where the average claim payout amounts to about 80 percent of the total premium.

38. The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk and title insurers typically out-source this task to title agents.

39. The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use.

These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

40.     TIRBOP publishes its final calculated title rates in the Manual of Title Insurance Rating Bureau of Pennsylvania. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value - proportional to property value or otherwise - to the consumer. Even search and exam costs are unrelated to property value. They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

41.     In *FTC v. Ticor*, 504 U.S. 621 (1992), the Supreme Court held that in order to be immune from liability for price-fixing, title insurance rate-setting bureaus had to be actively supervised by state agencies. Following the Supreme Court's instruction in Ticor, the Third Circuit, on remand in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state. According to the Circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active supervision requires the state regulatory authorities' independent review and approval." *Id.* at 1139.

42.     Through TIRBOP, Defendants have set up a rate-setting scheme to get around the rigors of state oversight required by *Ticor*. They have done so by calculating a single rate that comprises both risk and agency commission costs and by out-sourcing to title agents the agency commission costs. In this way, Defendants avoid providing the Insurance Department with any

detailed breakout or backup for the bulk of the costs.

43. TIRBOP merely submits an aggregated figure that is supposed to represent the total agency commission costs. Embedded within this figure is the vast quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance. Defendants' design in all of this has been to effectively "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

44. In a report dated April 2007, the U.S. Government Accountability Office ("GAO") stated that the title insurance industry is in need of greater state regulation. The GAO studied the industry conditions of several states, and concluded that "state regulators have not collected the type of data, primarily on title agents' costs and operations, needed to analyze premium prices and underlying costs."

45. Those Defendants who are Pennsylvania licensed title insurance companies are competitors in the sale of title insurance to consumers in Pennsylvania. Through TIRBOP, these title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supra-competitive rates for title insurance in Pennsylvania, (ii) include in their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents.

46. In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance in Pennsylvania and is a *per se* violation of Section 1 of the Sherman Act.

47. Defendants' price-fixing activity has been continuous throughout the relevant

damages period and has been renewed and reinforced through TIRBOP's submissions to the Insurance Department of supposed cost and revenue information and its periodic submissions of rate changes.

48. Through their collective price-fixing and manipulation of the regulatory process, Defendants have harmed competition by charging consumers supra-competitive prices for title insurance in Pennsylvania.

## IX. EFFECTS

49. The aforesaid combination and conspiracy has had the following effects among others:

    (a) price competition in the sale of title insurance has been suppressed, restrained and eliminated;

    (b) prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and,

    (c) purchasers of title insurance have been deprived of the benefit of free and open competition.

## X. DAMAGES

50. During the period of the antitrust violations by Defendants and their co-conspirators, Plaintiffs and each member of the Class they represent, have purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such than would have been paid in the absence of said antitrust violations. As a result, Plaintiffs and each member of the Class, have been injured and damaged in an amount presently undetermined.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand:

(a) That the alleged combination and conspiracy among the Defendants and their co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

(b) That judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs, and each member of the Class they represent, for threefold the damages determined to have been sustained by Plaintiffs, and each member of the Class, together with the cost of suit, including a reasonable attorneys' fee;

(c) Each of the Defendants, successors, assignees, subsidiaries and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, adopting or following any practice, plan, program, or design having a similar purpose or effect in restraining competition; and,

(d) Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Rule 38, F.R.C.P., Plaintiffs demand a trial by jury of the claims alleged herein.

DATE: April 22, 2008

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP

By: _____
Natalie Finkelman Bennett (PA Bar No. 57197)
35 E. State Street
Media, PA 19063
Telephone: 610- 891-9880
Facsimile: 610-891-9883

nfinkelman@sfmslaw.com

Jayne A. Goldstein
MAGER & GOLDSTEIN, LLP
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone: 954-515-0123
Facsimile: 954-515-0124
jgoldstein@magergoldstein.com